**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

```
                                 :
TERRY ELSEMORE, FRACTIONAL       :
STRATEGIES, LTD.                 :
     Plaintiffs,                 :
                                 :
     v.                          :   No. 8:05-cv-306
                                 :
LAKE PLACID GROUP, LLC,          :
     Defendant.                  :
                                 :
```

<u>**OPINION AND ORDER**</u>

Plaintiffs, Terry Elsemore and Fractional Strategies, Ltd., entered into an employment contract with Defendant, the Lake Placid Group, LLC ("LPG").  Pursuant to this contract, Elsemore served as a consultant for the development of the Whiteface Lodge ("Lodge") in Lake Placid, New York.  Following Elsemore's termination on May 10, 2004, Plaintiffs brought this suit seeking damages arising out of LPG's alleged breach of contract.  A bench trial was held on October 3 and 4, 2007; the principal issue presented was whether just cause existed for Elsemore's termination.  At trial, Plaintiffs also sought to amend the caption to add Resort Holdings — Lake Placid, LLC ("Resort Holdings") as a Defendant in this matter.  For the following reasons, the Court grants Plaintiff's Motion to Amend and enters judgment in favor of the Plaintiffs.

## I. FACTS

*A.  The Genesis of the Whiteface Lodge*

Joseph Barile is the sole owner and member of LPG.  As the principal of various corporate entities, Barile has worked as a real estate developer in the Lake Placid area since 1983.  In 1999, LPG purchased the property where the Lodge was subsequently built.  LPG continued to own the property through 2003 when construction of the Lodge began.  Subsequently the property was acquired by Resort Holdings, another entity of which Barile was the sole owner and member.

Built in the Adirondack revival style, the Lodge is a residential condominium hotel featuring eighty-five luxury suites and housing a number of businesses including restaurants, retail stores, and a full-service spa.  In addition to providing traditional hotel accommodations, the Lodge also offers full and partial ownership opportunities.  Under the Lodge's offering plan, units are to be sold in one-sixth fractional interests. Fractional ownership is largely akin to timeshare ownership, but is structured somewhat differently and is generally marketed for higher-end properties.  The mechanics are as follows: a buyer who purchases a one-sixth fractional at the Lodge obtains a fee simple interest in the unit for every sixth week (approximately eight weeks per year) in perpetuity.

The original plans, however, differed a great deal from the

Lodge's present form.  Initially, Barile had planned to construct a high-quality extended-stay hotel.  Plans for the extended-stay hotel were approved by local authorities in February, 2003, and construction was begun in April, 2003.  Barile had secured $8.8 million to finance the project.  In the summer of 2003, Barile learned of the fractional resort model and came to believe that this model would be ideally suited to the Lake Placid market and potentially more profitable.  As a result, Barile decided to alter the plans for the project and began to work towards development of the Lodge as it now stands.  As part and parcel of this shift, Barile also decided to enhance the scale of the project and to add a number of amenities, including indoor/outdoor pools, a year-round skating rink, restaurants, a spa and a fitness center.  With these changes came concomitant increases in costs.  As of the fall of 2003, Barile projected that the project would cost between twenty to thirty million dollars; however, at trial Barile estimated that the actual costs were in the forty to fifty million dollar range.

B.  *Elsemore's Background and Experience*

Despite Barile's extensive experience as a real estate developer, he had never before undertaken a fractional ownership project.  Consequently, at this time he also began to consider hiring a consultant with experience in fractional sales to assist with the project.  In November of 2003, Elsemore contacted David

3

Holley, an agent of LPG, to offer his services.  Elsemore began negotiations with Holley, subsequently meeting with Barile on at least two occasions to discuss his employment with LPG before they executed a contract.

Elsemore has worked in real estate development for almost twenty years, predominantly concentrating on sales and marketing of fractionals.  Elsemore began working on fractional sales at the Sugarloaf Mountain Hotel while he was with the Downes Marketing Group in 1988.  For the next ten years, while with the American Skiing Corporation, Elsemore worked on some of the first fractional condominium projects in the Northeast.  After leaving the American Skiing Company, Elsemore founded his own consulting enterprise, Fractional Strategies.  In recent years he has worked directly with various large fractional developments in the region, including Okemo and Hunter Mountain, heading the sales and marketing efforts.

C.  *The Employment Contract and Addendum*

The parties entered into an employment contract dated December 5, 2003 whereby LPG agreed to engage Elsemore as a consultant for a one-year term.  The contract provides that Elsemore is to receive a base salary of $350,000.  The contract further stipulates that the salary be paid in monthly increments of $12,000 until the first closing of a unit in the Lodge occurs. At that time, the balance for all the previous months ($17,167

per month) becomes immediately payable.  After the first closing, Elsemore is to receive $29,167 per month through to the end of his term.

In addition, the contract provides for a three-tiered performance bonus tied to the total sales volume in the first fiscal year.  The fiscal year is defined to run from the date on which the offering plan is approved by the New York State Attorney General; sales volume is defined to include all sales contracts that are executed within the time period provided that title is in fact subsequently transferred.  Elsemore is entitled to a bonus of $30,000 if sales volume reaches $10,000,000; $60,000 if sales volume reaches $12,500,000; $100,000 if sales volume reaches $15,000,000.

The contract also provides that LPG is to provide Elsemore with "permanent and mutually acceptable housing and housing expenses" while he is on site.  In December and January, Elsemore stayed at a local hotel while in Lake Placid, and either LPG or Resort Holdings reimbursed him for the cost of his accommodations.  At this point, Elsemore and Barile discussed obtaining rental housing for the remaining ten months.  Because Elsemore desired to rent accommodations that were more expensive than Barile had anticipated, Elsemore and Barile agreed that Resort Holdings would pay sixty percent of Elsemore's rent for a ten-month lease in Lake Placid ($1,500 per month, totalling

$15,000)and that Elsemore would be responsible for the balance.

Under the contract, Elsemore is responsible for overseeing the marketing and sales campaign for the Lodge, and is "vested with a wide range of authority and discretion in organizing, promoting, and consummating sales" at the Lodge.  Addendum A to the contract specifies Elsemore's duties in greater detail, including the following: development of a fractional share interval scheme, usage matrix and pricing matrix; development and management of the retail sales budget and advertising and marketing programs; recruitment and training of a sales director, agents, and administrative staff; and coordination of substantially all the functional requirements of the sales effort.

The contract explicitly declines to "define days or hours of work," but the addendum "anticipates" that Elsemore will work four days per week, three days per week being spent on site.  The addendum stipulates that the number of days will be reduced once the sales program is "fully operational."  In addition, the contract specifically permits Elsemore to engage in other business activities during the term of his employment.

Finally, the addendum states that Elsemore will provide the project "with the expertise of Sherman Potvin or an individual with comparable talent and capability."  Potvin is an individual with previous fractional sales experience and with whom Elsemore

had previously worked; he was considered by the parties as a potential candidate for the sales director position.

D.  *Development of the Project During Elsemore's Tenure*

Elsemore began working on the project in December, 2003, and both Elsemore and Barile have testified that they worked closely together.  As part of his duties, Elsemore created a detailed sales and marketing plan and developed a number of documents for the project, including a sales and marketing budget, cost allocations, and pricing schedules.  In completing these tasks, Elsemore relied on his experience in previous fractional condominium projects and on representations from Barile.  In particular, Elsemore relied on Barile for information regarding projected construction costs, unit sizing, and product specifications.  Based on this information, Elsemore furnished Barile with pricing matrix spreadsheets.  In considering the issue of pricing, Barile consulted with Elsemore as well as with Holly and other advisors.

Barile has contended that Elsemore undervalued and underpriced the Lodge units.  However, the evidence shows that Barile had final authority over the pricing determination.  The evidence also shows that Barile fully consented to the offering plan submitted to the Attorney General in April of 2004.  The Defendants have failed to offer any proof that the units were in fact underpriced.  However, to the extent that they may have been

underpriced, this determination would have to be made in relation to the actual project costs.  Yet, according to Barile's own testimony, at the time that Elsemore was developing the pricing matrix, Barile had represented that the construction costs would total approximately $20 million.  As Barile constantly sought to enhance the accommodations and amenities at the Lodge, costs soared.  Elsemore did not know, and Barile did not let him know, of the increased costs, an increase of between $20 and $30 million.

Prior to the execution of Elsemore's contract, Barile had already hired two salespeople, Beverly Shaefer and Laura Nardiello.  Shaefer, who is Barile's sister-in-law, had no prior sales experience; Nardiello, a friend of Barile, had experience in advertising sales, but lacked any fractional sales experience. Elsemore found Colleen Holmes and recommended that Barile hire her as the team's third salesperson.  Holmes is a licensed real estate broker and had previous real estate sales experience. Barile decided to hire Holmes and later promoted her to the sales director position (after Elsemore's termination).

Elsemore was also responsible for locating an appropriate candidate for the sales director position.  Elsemore initially attempted to hire Sherman Potvin; however, Potvin was not interested in the position.  Subsequently, Elsemore identified and recommended to Barile that Mark Keneston be hired as Sales

Director.  Although Keneston had not previously worked in real estate, he had experience in both sales and sales management, having previously been employed as a sales manager at a Vermont car dealership.  According to Barile, Keneston was "a professional" and "presented well," and Barile decided to hire Keneston for the sales director position.

The Defendants have argued that Keneston was lacking in expertise and that his hire represented a failure by Elsemore to meet his obligations as set forth in the addendum to the employment contract.  However, the addendum does not provide any specific benchmarks for the sales director position.  It states only that Elsemore find a candidate of "comparable talent and capability" to Sherman Potvin.  The Defendants have not provided any proof that Keneston lacked the requisite talent and capability.  And the facts do not support such a conclusion: Keneston was well-regarded by Barile and Barile approved his hire.

Keneston participated in a training in February, 2004, and began working at the office in March.  Soon after Keneston arrived, Barile received reports from his sister-in-law that Keneston had been attempting to purchase or sell a car online while at work.  Barile spoke with Elsemore and instructed him to notify Keneston that Barile considered this conduct inappropriate.  Elsemore accordingly met with Keneston.  Shortly

thereafter, in April, 2004, Keneston quit his position.  Although Barile has alleged that Elsemore handled the incident poorly, there is no evidence that Elsemore was in any way responsible for Keneston's departure.  To the contrary, the record indicates that Keneston and Elsemore were on good terms and that Keneston's decision was motivated by other factors.  In the three-week period following Keneston's departure and preceding his own termination, Elsemore made efforts to find a new Sales Director, interviewing at least two candidates.

By April of 2004, Elsemore had taken significant steps to train the sales staff, including organizing a five-day training session led by fractional expert, Tom Goeschious.  However, the sales and marketing effort was behind schedule because of delays with other aspects of the project, including delays in the construction schedule and legal submissions.  The sales team had not actually begun soliciting buyers because under New York law, such measures are substantially restricted until the offering plan is approved.

Testimony from both Elsemore and Barile indicates that Barile wished to be highly involved at every level of decision-making both with regard to Elsemore's duties and those of the sales staff working under Elsemore.  For example, as Keneston was developing the sales manual, Barile required that draft copies of every page of the sales manual be submitted to him and David

Houston[1] for review.  The record also indicates that Barile
carefully scrutinized a number of Elsemore's decisions with
regard to sales and marketing, even in those areas where the
contract provides Elsemore with broad discretion.  Barile has
asserted that he did not approve of some of Elsemore's marketing
strategies.  However, there is no proof that this reflects a
failure by Elsemore to adequately perform his duties.  Rather the
evidence shows only that there were differences of opinion with
regard to certain highly nuanced determinations (such as, for
example, what type of photographs should be included in the
promotional brochures).

     Defendants have generally alleged that there was low morale
in the office.  Both witnesses attested to the fact that
Elsemore's management style differed from that of Barile.  In
addition to Keneston's personal use of office computers, Barile
testified about his concern over personal long-distance phone use
by Deborah Spencer, the marketing manager.  Although Elsemore
discussed these issues with employees when Barile voiced his
complaints, Elsemore indicated that he did not consider such
matters to be high-priority.  Regardless of the differences in
styles, Defendants have failed to show any adverse impact based

_____

     [1]  David Houston, a longtime friend of Barile, owns and
operates Delta Marketing, a marketing company in Vermont.
Houston was involved with the Lodge primarily to assist with
creative marketing (development and design of collateral
materials).

on Elsemore's management.  Specifically, there is no evidence
that Elsemore was ineffective or that his subordinates were
deficient in their work product.  In addition, the Defendants
have submitted no evidence to support the claim of low morale.

E.  *Reasons for Termination*

At the beginning of May, Barile left the site for a few days
to attend a trade conference in Las Vegas.  Before leaving,
Barile asked Elsemore to prepare a general report on the status
of the marketing efforts, detailing which tasks had been
completed and which remained.  While Barile was away, Elsemore
had a conversation with David Houston regarding his frustrations
with the project.  In the course of this conversation, one of the
two raised the idea that Barile could potentially "buy out" the
remainder of Elsemore's consulting contract, and Elsemore stated,
in substance, "maybe I should discuss a buyout."

Soon after this conversation, Houston advised Barile that
Elsemore had mentioned the possibility of a "buy-out."  Barile
testified that he had no plans to terminate Elsemore before
learning of this conversation.  Upon receiving this report,
Barile did not contact Elsemore for a few days.  Instead, Barile
"took a step back," considered a number of factors and eventually
decided to terminate Elsemore.

Based on the report from Houston, Barile speculated that
Elsemore intended to leave.  In particular, Barile was concerned

because Elsemore had made statements about moving with his family from Vermont to Maine a few weeks earlier.  These statements were made in the following context: in April, Elsemore had helped Barile to locate and secure an additional $8.5 million in financing for the Lodge, and had asked Barile, in exchange, to consider accelerating some of the payments owed under the contract.  Elsemore specifically indicated that the accelerated payments would be helpful because he was closing on a home in Maine.  Shortly before leaving for Las Vegas, Barile told Elsemore that he had decided not to accelerate any payments. After learning of Elsemore's conversation with Houston, Barile interpreted Elsemore's planned move to Maine as confirmation of his desire to leave.

Elsemore has testified that he and his family had a longstanding plan to move to Maine by the end of 2004 and that he had mentioned this fact during the initial contract negotiations. In addition, he testified that until his termination, he and his family had intended to spend the summer in Lake Placid and to move to Maine in the fall.  Furthermore, he has asserted that the move, although lengthening his weekly commute, would not have impaired his ability to meet his obligations under the contract. In fact, subsequent to his termination, Elsemore has worked on other projects in New York at an equal or greater distance from his Maine residence.

In justifying the termination, Barile has also pointed to a number of alleged deficiencies in Elsemore's performance of his duties.  The principal among these have already been discussed above in detail: the inappropriateness of Elsemore's pricing figures, ineffectiveness of specific marketing strategies, and poor management of sales team.  In each case, the Court has found that the evidence does not support such allegations.  Although there were apparent differences of opinion with regard to certain aspects of the marketing strategy, nothing in the record indicates that Elsemore failed to carry out his responsibilities as specified in the contract.  Nor is there any evidence that Elsemore showed any lack of respect during professional disagreements or failed to conform with Barile's ultimate decisions.

The only evidence of noncompliance on Elsemore's part concerns the new sales office.  In April of 2004, the project established a new sales office on Main Street in Lake Placid to which the sales staff relocated.  Elsemore and Spencer remained at the old office.  After Keneston's departure, Barile proposed that Elsemore relocate to the Sales Director's office in the new location, but Elsemore informed Barile that he did not want to move and did not intend to act as Sales Director.  There is no evidence that Barile insisted that Elsemore move, nor that he repeated his request.  The Court finds that there is insufficient

evidence to support a claim of insubordination by Elsemore.

## II. DISCUSSION

*A.  Motion to Amend*

Before treating the principal legal question, the Court confronts a preliminary issue.  During trial, Plaintiffs sought to amend the caption to add an additional defendant, namely Resort Holdings.  Although Elsemore entered into a contract with LPG, Elsemore's duties under the contract were solely directed to the Whiteface project. Shortly after the execution of Elsemore's contract, Barile transferred ownership and control of all aspects of the Whiteface project from LPG to Resort Holdings.  The record reflects that this transfer did not affect Elsemore's day-to-day performance; he continued working for Barile throughout. Nonetheless, in a technical sense, after the transfer, Elsemore's dealings were with Resort Holdings and the services he performed were for the benefit of Resort Holdings.  Moreover, the evidence indicates that Barile had total control in deciding which corporate entity would exercise formal ownership and management of the project.

The Federal Rules provide for liberal amendment at the discretion of the Court where the interests of justice require.  *See* Fed. R. Civ. P. 15(a), 21.  Amendment may be made "at any time" and "at any stage of the action."  *Id.*  A Court should deny such a motion if there is (1) undue delay, bad faith or repeated

failures to cure deficiencies by the moving party, (2) undue prejudice to the opposing party, or (3) futility. *Dluhos v. Floating and Abandoned Vessel, Known as "New York"*, 162 F.3d 63, 70 (2d Cir. 1998) (citing *Foman v. Davis*, 371 U.S. 178, 182-83 (1962)).

The Court finds that there is no evidence of undue delay or bad faith on the part of the Plaintiffs.  Because discovery concluded long before the trial began, Plaintiffs have represented that they did not learn relevant facts about the status of LPG until trial, at which time Plaintiffs immediately moved for amendment.  There is no indication of undue prejudice, given that Barile, sole owner and member of both entities, was fully informed of the proceedings at all stages.  Nor have the Defendants proven their claim of futility.  Defendants have argued that the claim is futile because Resort Holdings was dissolved prior to trial.  However, N.Y. Bus. Corp. Law § 1006 provides that dissolution does not, in and of itself, act as a bar to claims.  Therefore, the Court grants Plaintiffs' motion to amend and adds Resort Holdings as a defendant.

B.  *Just Cause*

We analyze Plaintiffs' breach of contract claim under New York law.[2]  Accordingly, an employment contract may be legally

---

[2] The Court is sitting in diversity and thus applies New York state choice-of-law rules.  The parties are in agreement that the "grouping of contacts" analysis decisively favors the

terminated prior to its expiration only for just cause.  *Alpern v. Hurwitz*, 644 F.2d 943, 945 (2d Cir. 1981).  The New York Court of Appeals has yet to provide an authoritative definition of just cause.  In such cases, the Court must attempt to "predict how the New York Court of Appeals would resolve the state law question."  *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005).  In so doing, we look to decisions from state intermediate appellate courts as well as from other jurisdictions upon which the Court of Appeals may rely.  *Id*.

A number of state high courts as well as state legislatures have defined just cause, and the definitions are largely consistent, looking to whether the employer's decision to terminate was objectively reasonable.  *See In re Brooks*, 382 A.2d 204, 207 (Vt. 1977); *Avon Products, Inc. v.* Wilson, 513 A.2d 1315, 1317 (Del. 1986); *Guz v. Bechtel Nat'l, Inc.*, 8 P.3d 1089, 1100 (Cal. 2000); Mont. Code Ann. § 39-2-903(5).  In elaborating its definition of just cause, the Vermont Supreme Court wrote: "Just cause means some substantial shortcoming detrimental to the employer's interests which the law and a sound public opinion recognize as a good cause for his dismissal... The ultimate criterion of just cause is whether the employer acted reasonably in discharging the employee because of misconduct.  We hold that

---

application of New York law over the contract claim.  *See In re Allstate Ins. Co.*, 613 N.E.2d 936 (N.Y. 1993).

a discharge may be upheld as one for "cause" only if it meets two criteria of reasonableness: one that it is reasonable to discharge employees because of certain conduct, and the other, that the employee had fair notice, express or fairly implied, that such conduct would be ground for discharge."  *In re Brooks*, 382 A.2d at 207-08.

The state appellate courts have looked to a number of factors in determining whether just cause exists.  First, courts have noted that insubordination may provide a ground for dismissal "[w]hen the continuous refusal to comply with lawful and reasonable directions of an employer reaches such proportions as to be deleterious to the employer's interests, is inconsistent with continuance of the basic employer-employee relationship, and effectively stalls the conduct of important and duly authorized business affairs."  *Rudman v. Cowles Communications, Inc.*, 315 N.Y.S.2d 409, 412 (1st Dept. 1970); *see also Trieger v. Montefiore Medical Center*, 789 N.Y.S.2d 42 (1st Dept. 2005); *Reilly v. Polychrome Corp.*, 872 F.Supp. 1265 (S.D.N.Y. 1995); *Schenk v. Red Sage, Inc.*, No. 91 Civ. 7868, 1994 WL 18640 (S.D.N.Y. 1994).  Additionally, various forms of employee conduct, if sufficiently egregious, may provide just cause: willful and continued personal misconduct, *Bradford v. Weber*, 525 N.Y.S.2d 968, 970 (3d Dept. 1988); poor business judgment, *id.* at 971; and breach of the duty of fair dealing, *Harmon v. Adirondack*

18

*Community College*, 784 N.Y.S.2d 663 (3d Dept. 2004).  The
defendant employer bears the burden of proving that just cause
existed.  *Bradford*, 525 N.Y.S.2d at 970.

Under the facts of this case, the Court need not fine-tune
the definition of just cause because Elsemore's conduct falls so
far below the established threshold.  The evidence does not
support Defendants' allegations that Elsemore was ineffective or
incapable of performing his duties, displayed poor business
judgment, or otherwise failed in any way to fulfill his duties
under the contract.  Defendants have failed to establish that
Elsemore acted insubordinately.  *See, e.g. Trieger*, 789 N.Y.S.2d
at 42 (where employee circulated memo to all other department
chairs at defendant hospital, "strongly criticizing defendant's
management and, inter alia, urging his cochairs 'to set things
right and reclaim the[ir] prerogatives and responsibilities'").
Defendants have also failed to establish that there was low
morale or that the sales staff lacked respect for Elsemore.

In addition, the evidence does not support Defendants' claim
that the contemplated purchase of a residence in York, Maine
precluded Elsemore from performing his duties.  Defendants have
argued based on *Harmon* that a change of residence is sufficient
to constitute just cause.  This is a misreading of *Harmon*.  In
*Harmon*, the employee, president of a New York community college,
had taken a new full-time position with a college in California

19

while on administrative leave; the pivotal fact was Harmon's acceptance of outside employment.  784 N.Y.S.2d at 663.  The facts of this case are readily distinguishable: Elsemore's conduct entailed no conflict of interest and there was no breach on his part of the duty of fair dealing.  Given that Elsemore already lived out-of-state and commuted weekly to Lake Placid, there is no indication that the move would interfere with his employment duties.

Thus the sole reason for termination established by the Defendants is that Elsemore made private statements to a colleague indicating that he was considering discussing a potential "buy-out" with Barile.  Based on this, Barile speculated that Elsemore intended to leave.  Elsemore never indicated any unwillingness to complete the contract, nor was his work unsatisfactory.  Elsemore's statements to Houston could not be reasonably construed as a demand to leave.  Consequently, Defendants have failed to establish that just cause existed for the termination.  The Court finds Defendants liable for breach of the employment contract.

*C. Damages*

Elsemore is entitled to a base salary of $350,000 under the contract.[3]  Prior to termination, Elsemore received $49,000 of his

---

[3]  No evidence has been presented with regard to the sales volume, and the Plaintiffs have indicated that they are not seeking to recover any potential performance bonus to which

salary.  Elsemore made substantive efforts to obtain substitute
employment.  These attempts, however, were unsuccessful and
Elsemore did not obtain substitute employment until after
December, 2004.  Consequently, there is no mitigation and
Elsemore is entitled to recover the full amount of the contract
minus the payments he received prior to his termination, in
total, $301,000.

Elsemore has also sought to recover housing costs.  The
employment contract states that Elsemore "will be provided with
permanent and mutually acceptable housing and housing expenses."
Elsemore and Barile offered consistent testimony indicating that
they came to an oral agreement elaborating and modifying this
term of the contract.  Elsemore desired to rent an apartment in
Lake Placid that was more expensive than Barile had anticipated.
The parties came to a compromise whereby Elsemore would rent the
apartment for $2,500 per month and Barile would reimburse
Elsemore for sixty percent of the rent ($1,500 per month).
Elsemore agreed to pay the remaining $1,000 per month out of his
own pocket and entered a ten-month lease for the property.[4]

_____

Elsemore may have been entitled under the contract.

   [4]  A lease agreement between Elsemore and Jean Slutzky, the
landlord, was drafted but never signed.  Defendants have argued
that the underlying obligation is not enforceable because the
lease agreement was not executed.  However, based on the
representations of both parties, the Court finds that Barile
agreed to contribute $15,000 in total towards Elsemore's housing
costs.  Barile did not enter into any contractual relationship

After his termination, Elsemore attempted to mitigate the housing costs.  In total, Elsemore has testified that he paid $14,500 towards the lease.  Elsemore is entitled to receive sixty percent of this balance, $8,700 in total, from Defendants minus payments made by the Defendants prior to Elsemore's termination. Barile testified credibly that Resort Holdings paid $4,500 towards this obligation, thus Elsemore is entitled to $4,200 in housing costs.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Amend the Caption is GRANTED and Resort Holdings — Lake Placid, LLC is added as Defendant.  Furthermore, the Court hereby ORDERS judgment in favor of Plaintiffs.  The Court specifically finds that Plaintiffs are the prevailing parties and that Defendants are liable to Plaintiffs for breach of contract in the amount of $305,200.

Dated at Burlington, Vermont this 7th day of December, 2007.

/s/William K. Sessions III
William K. Sessions III[5]
Chief Judge

---

with Slutzky.  The landlord's lack of legal remedy in recovering the debt from Elsemore does not absolve Defendants of their independent duty to Elsemore.

[5]Sitting in the Northern District of New York by designation.